## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| STEALTHPATH IP INC., | Civil Action No.: _____ |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| FORTINET, INC., | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff StealthPath IP Inc. ("StealthPath") brings this action against Fortinet, Inc. ("Defendant" or "Fortinet"), and alleges as follows:

## NATURE OF THE ACTION

1.    This is a civil action for patent infringement, brought under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, seeking damages and other relief arising out of Fortinet's infringement of United States Patent Nos. 10,374,803 ("'803 patent"), 10,965,646 ("'646 patent"), and 11,729,143 ("'143 patent") (collectively, the "Asserted Patents").

## THE PARTIES

2.    Plaintiff StealthPath is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1900 Reston Metro Plaza, #600, Reston, Virginia 20190.

3.    StealthPath owns the entire right, title, and interest in and to each of the Asserted Patents.  The Asserted Patents were the product of StealthPath's research and development that resulted in innovative technologies related to software-defined networks and "zero trust" cybersecurity.

4.      StealthPath, by and through Stealthpath Inc., makes and sells a number of products that embody technology claimed in the Asserted Patents, including ZAware, ZAlert, ZConsole, and ZProtect.  StealthPath has regularly and consistently marked its patent-practicing products, complying with 35 U.S.C. § 287, including by providing notice through its webpage.[1]

5.      On information and belief, Defendant Fortinet is a corporation organized and existing under the laws of the State of Delaware.  On information and belief, Fortinet has regular and established places of business in this District, including at 6735 Salt Cedar Way, Frisco, Texas 75034[2] and 6111 W Plano Pkwy, Plano, TX 75093[3].  Fortinet is registered with the Secretary of State to do business in Texas.  Fortinet can be served with process through its registered agent for service of process, Corporation Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

6.      StealthPath repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

7.      The claims in this action arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*  This Court has subject matter jurisdiction over StealthPath's claims of infringement of the Asserted Patents pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      The Court has personal jurisdiction over Fortinet, consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute, due at least to Fortinet's substantial business in the State of Texas and this District, including through

---

[1] https://stealthpath.com/patents/ (last visited November 10, 2025).

[2] *See* https://www.fortinet.com/corporate/about-us/global-offices (last visited November 10, 2025).

[3] *See* https://www.linkedin.com/company/fortinet (last visited November 10, 2025).

its past and ongoing infringing activities.  Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ § 17.042(2).

9.    Upon information and belief, Fortinet has regularly and systematically transacted business in Texas, including in this District, directly or indirectly through subsidiaries or intermediaries, and/or committed acts of patent infringement in Texas, including in this District, as alleged in detail below.

10.    Venue in this District is proper under 28 U.S.C. § 1400(b) because Fortinet has a regular and established place of business in this District and has committed acts of patent infringement in this District, including through the actions of employees at its Frisco office.

11.    On information and belief, Fortinet employs engineers at its Frisco office who are responsible for designing, developing, deploying, and supporting the infringing technologies.  For example, Fortinet has a job posting for a Technical Support Engineer at its Frisco location whose requirements include "knowledge and/or experience in each of the following: 1) Network and Internet Security: Firewalls, Access Control, VPN, IPSec, SSL, NAT, IPS, IDS, Encryption, Authentication, Authorization, Data Leak Prevention; 2) Network Technologies: Ethernet, ARP, TCP, UDP, IP, DNS."  Ex. 4.  As another example, LinkedIn profiles indicate Fortinet employs several systems engineers with the infringing technologies as core responsibilities in its Frisco office.  *See, e.g.,* Exs. 5-7.

## FACTUAL ALLEGATIONS

12.    StealthPath repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

### A.  The Asserted Patents

13.    The '803 patent is entitled "Methods for Internet Communication Security" and was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on

August 6, 2019.  StealthPath owns the entire right, title, and interest in and to the '803 patent.  A true and correct copy of the '803 patent is attached hereto as Exhibit 1.

14.    The '646 patent is entitled "Methods For Internet Communication Security" and was duly and legally issued by the USPTO on March 30, 2021.  StealthPath owns the entire right, title, and interest in and to the '646 patent.  A true and correct copy of the '646 patent is attached hereto as Exhibit 2.

15.    The '143 patent is entitled "Methods For Internet Communication Security" and was duly and legally issued by the USPTO on August 15, 2023.  StealthPath owns the entire right, title, and interest in and to the '143 patent.  A true and correct copy of the '143 patent is attached hereto as Exhibit 3.  The application that issued as the '143 patent is a continuation of the application that issued as the '646 patent.

16.    StealthPath, as the owner of all rights, title, and interest in and to the Asserted Patents, possesses all rights to sue and recover past and future damages for infringement of the Asserted Patents.

17.    The techniques claimed in the Asserted Patents provide specific, novel, and non-obvious solutions to problems arising in the field of cybersecurity.  For example, the inventors of the Asserted Patents recognized a "need to address security threats that can arise during hypervisor-mediated communications" in which "malware may target applications in virtual machines either directly or through the hypervisor."  *See, e.g.*, Ex. 1 at 1:31-36.  The Asserted Patents describe and claim inventive techniques directed to addressing such problems, for example through the use of "a network security layer resident in the hypervisor that authenticates and authorizes incoming communications before transmission to virtualized components."  Ex. 1 at 1:45-52.  Such techniques provided a specific solution to problems in the field of cybersecurity, and the claimed

4

techniques were neither conventional nor routine.

18.    For example, the '803 patent claims "[a] product for authorizing network communications in a hypervisor" that includes "computer-readable program code executable in a hypervisor to perform communication management operations" that include: i) "intercepting a first network packet in the hypervisor," where the packet includes a "higher-than-[Open Systems Interconnection (OSI)] layer three portion" ii) "decrypting" at least a portion of the higher-than-OSI layer three portion with a "single-use cryptographic key" in order to obtain "packet parameters," iii) "authorizing the first network packet in the hypervisor" by "comparing" the "packet parameters" with "expected values," and iv) "passing the authorized first network packet to a virtual device."  Ex. 1 at 283:58-284:8 (claim 1).  As the specification of the '803 patent explains, such techniques improved security by, for example, assisting in detection and prevention of "malware configured to exploit security shortcomings in hypervisors, for example through holes in memory management."  Ex. 1 at 22:49-61.

19.    Additional claims of the '803 patent recite limitations that, alone or in combination, are directed to inventive concepts that also were unconventional and not well-known or routine. For example, claim 2 of the '803 patent further requires, among other limitations, "detecting negotiation of a secure communication pathway between a first remote node and the virtual device" and "confirming success of the negotiation prior to the passing the authorized first network packet [to the virtual device]."  Ex. 1 at 284:9-22 (claim 2).  As the specification of the '803 patent explains, "Internet protocols allow open access for computer users to remotely access other computers and information stores easily from any access point, resulting in many points of attack for malware."  *Id.* at 167:9-12.  As such, the techniques disclosed and claimed in the '803 patent "provide, for example, improvements to existing computing technology for packet-based network

communications" by addressing "flaws in software and imperfect trust relationships between communicating devices." *Id.* at 167:12-16.

20.     Likewise, the inventors of the Asserted Patents recognized that vulnerabilities existed in networks by virtue of weak-links in the network security in the form of legacy systems and devices that might not be able to support advanced techniques for detection and remediation of malware attack vectors.  As such, the inventors of the Asserted Patents set about developing "interfaces to immunize, or to at least limit the attendant risks of, communications between protected and unsecure networks."  Ex. 2 at 1:30-50.

21.     The '646 and '143 patents describe and claim inventive techniques directed to addressing such problems, for example through the use of "bridging network communications between device networks sharing protected, trusted Ethernet-based communications with the large body of relatively unsecure legacy devices and networks."  Ex. 2 at 1:51-56.  Such techniques provided a specific solution to problems in the field of cybersecurity, and the claimed techniques were neither conventional nor routine.

22.     For example, claim 1 of the '646 patent recites, among other limitations, "[a] product for securing communications of a plurality of networked computing devices" comprising code embodied on a "non-transitory computer-readable storage medium" that is "executable by a processor to perform communication management operations" comprising: i) "receiving a first port-to-port network packet from a first computing device"; ii) "establishing a secure communication pathway with a user-application at a second computing device" using a specific sequence of steps; iii) "confirming a payload of the first port-to-port network packet conforms to a data model pre-assigned to the pre-established value for the user-application"; and iv) "passing the payload to the second computing device via the secure communication pathway."  Such

techniques provided a specific solution to problems in the field of cybersecurity, and the claimed techniques were neither conventional nor routine.

23.     Additional claims of the '646 patent recite limitations that, alone or in combination, are directed to inventive concepts that also were unconventional and not well-known or routine. For example, claim 15 of the '646 patent further recites: a) "sending a nonpublic first identification code to a network security software on the second computing device of the plurality of networked computing devices via the pre-established communication pathway"; b) "receiving, in response to the sending, a nonpublic second identification code for the second computing device"; and c) "comparing the nonpublic second identification code with a pre-established value for the second computing device."

24.     Similarly, claim 1 of the '143 patent recites, among other limitations "[a] product for securing communications of a plurality of networked computing devices" comprising code embodied on a "non-transitory computer-readable storage medium" that is "executable by a processor to perform communication management operations" comprising: i) "consuming a first network packet to obtain a first payload and a destination port number"; ii) "confirming the first payload conforms to at least one of a data model pre-assigned to the destination port number" using a specific sequence of steps; iii) "forming a second network packet comprising a second payload, and at least one of a local program identification code, and a data model identification code"; and iv) "executing at least one instruction to send the second network packet to network security software to the destination port on the one of the plurality of networked computing devices via a secure communication pathway."  Such techniques provided a specific solution to problems in the field of cybersecurity, and the claimed techniques were neither conventional nor routine.

25.     Additional claims of the '143 patent recite limitations that, alone or in combination,

are directed to inventive concepts that also were unconventional and not well-known or routine. For example, claim 19 of the '143 patent further recites: a) "sending the local program identification code to the network security software via the pre-established communication pathway"; b) "receiving, in response to the sending, a remote application identification code for a remote application program"; and c) "comparing the remote application identification code with a pre-established value for the remote application program."  Such techniques provided a specific solution to problems in the field of cybersecurity, and the claimed techniques were neither conventional nor routine.

## B.  Fortinet's Accused Products

26.    Based on information presently known to StealthPath, and without the benefit of any discovery from Fortinet or the Court's claim construction, StealthPath accuses the Fortinet products supporting Secure SD-WAN, including Fortinet's FortiGate and FortiWiFi products, (collectively, the "Accused Products"), of infringement. StealthPath further reserves the right to supplement this identification of Accused Products as discovery progresses.

27.    As noted below, each element of at least one claim of each of the Asserted Patents is literally present in the Accused Products.  To the extent that any element is not literally present, each such element is present under the doctrine of equivalents because it performs substantially the same function in substantially the same way to achieve substantially the same result, and any differences between the Accused Products and claim element are insubstantial.

28.    Fortinet has also had knowledge of the Asserted Patents and its infringement of the Asserted Patents at least as of the date on which it was served with this complaint.

## C.  Claims for Patent Infringement

29.    The allegations provided below are exemplary and without prejudice to

infringement contentions provided pursuant to the Court's scheduling order and local rules. In providing these allegations, StealthPath does not convey or imply any particular claim constructions or the precise scope of the claims. StealthPath's claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and local rules.

30.     The below infringement allegations are based on publicly available information and a reasonable investigation of the Accused Products. StealthPath reserves the right to modify this description, including, for example, on the basis of information that it obtains during discovery about the Accused Products.

## COUNT I:  INFRINGEMENT OF U.S. PATENT NO. 10,374,803

31.     StealthPath repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

32.     Claim 1 of the '803 patent recites:

1.     A product for authorizing network communications in a hypervisor, the product comprising a non-transitory computer-readable storage medium having computer-readable program code embodied therein, the computer-readable program code executable in a hypervisor to perform communication management operations, the communication management operations comprising:

intercepting a first network packet in the hypervisor, the first network packet comprising a first higher-than-OSI layer three portion;

decrypting, with a single-use cryptographic key, at least a portion of the first higher-than-OSI layer three portion to obtain one or more first packet parameters;

authorizing the first network packet in the hypervisor, comprising: comparing the one or more first packet parameters with one or more first expected values; and

passing the authorized first network packet to a virtual device.

33.    The Accused Products infringe at least claim 1 of the '803 patent because the Accused Products satisfy each and every limitation of claim 1, either literally or under the doctrine of equivalents.

34.    For example, the Accused Products infringe claim 1 of the '803 patent because they comprise "[a] product for authorizing network communications in a hypervisor, the product comprising a non-transitory computer-readable storage medium having computer-readable program code embodied therein, the computer-readable program code executable in a hypervisor to perform communication management operations."   For example, the Accused Products "integrate firewalling, SD-WAN, and security in one appliance, making them perfect for building secure networks at distributed enterprise sites and transforming WAN architecture at any scale."



---





35.    The Accused Products are also executable in a hypervisor to perform communication management operations. For example, "[t]he FortiGate-VM offers organizations

---

[5] *See* https://www.fortinet.com/products/sd-wan (last visited November 10, 2025).

[6] *See* https://www.fortinet.com/solutions/enterprise-midsize-business/sd-wan-multi-cloud (last visited November 10, 2025).

the ability to design hyperconverged infrastructure that is both scalable and secure. It runs on Nutanix Acropolis Hypervisor (AHV) and gives you visibility into the applications your business is running while also preventing cyber threats."[7]



36.     The "computer-readable program code" of the Accused Products "is executable in a hypervisor to perform communication management operations" comprising "intercepting a first network packet in the hypervisor, the first network packet comprising a first higher-than-OSI layer three portion."  For example, the Accused Products can intercept an encrypted packet transmitted over an HTTPS session (e.g., a "first network packet comprising a first higher-than-OSI layer three portion"), as shown by the red arrow in the annotated example figure below.

---

[7] *See* https://www.fortinet.com/products/private-cloud-security/nutanix (last visited November 10, 2025).

[8] *See* https://www.fortinet.com/products/smallbusiness/virtual-firewall (last visited November 10, 2025).



37.    The Accused Products "enable secure networking to, form, and between clouds with FortiGate VM."

**FortiGate VM Use Cases**

**NETWORK PERIMETER SECURITY**
Protect networks from unauthorized access and external threats. Control traffic based on protocols, ports, applications, and user identities.

**APPLICATION CONTROL**
Enforce application-specific security and traffic policies with application control.

**THREAT DETECTION**
Utilize AI/ML-driven threat intelligence to detect threats in ingress and egress traffic without impacting performance.

**SEGMENTATION**
Isolate threats and prevent breach transversal with advanced network segmentation.

**SECURE REMOTE ACCESS**
Allow remote workers and branches to securely access resources with IPsec VPN and SD-WAN.

**SECURE CLOUD CONNECTIVITY**
Enable secure networking to, from, and between clouds with FortiGate VM.

---

[9] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/122078/deep-inspection (last visited November 10, 2025) (annotated).

[10] *See* https://www.fortinet.com/products/smallbusiness/virtual-firewall (last visited November 10, 2025).

1. Set up your FortiGate for initial management access with the GUI. See Setting up FortiGate for management access on page 31.

| For more information | Go to |
|---|---|
| Physical appliances, such as FortiGate | Go to FortiGate/FortiOS Hardware Guides to view QuickStart Guides for all supported FortiGate models. |
| Hypervisors, such as FortiGate-VM on ESXi, KVM, Hyper-V, and so on. | Go to FortiGate Public Cloud or FortiGate Private Cloud and follow the deployment section of the administration guide for your hypervisor, for example, Microsoft Hyper-V Administration Guide > Deployment. |

[11]

38.     The "computer-readable program code" of the Accused Products "is executable in a hypervisor to perform communication management operations" comprising "decrypting, with a single-use cryptographic key, at least a portion of the first higher-than-OSI layer three portion to obtain one or more first packet parameters."  For example, the Accused Products can decrypt " at least a portion of the first higher-than-OSI layer three portion" using a single-use cryptographic key, as shown by the red arrow in the annotated example figure below.



[12]

---

[11] *See* https://docs.fortinet.com/document/fortigate/7.6.4/administration-guide/383477/summary-of-steps (last visited November 10, 2025).

[12] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/122078/deep-inspection (last visited November 10, 2025) (annotated).

## Deep packet inspection

There are two modes for SSL inspection. Both allow the FortiGate to inspect encrypted traffic, and when configured properly, this is done transparently to the user. Certificate management, including provisioning and installing, is not included in this guide. See Deep inspection in the FortiGate Admin Guide for more details.

### Multiple clients connecting to multiple servers

In this mode, FortiGate will intercept the SSL handshake and replace the server certificate with a self-generated server certificate on the fly. This certificate will be very similar to the original server certificate, but it will be signed by CA that you have on the FortiGate. By default, FortiGate will be using a unique Fortinet_CA_SSL certificate (different on each FortiGate) to sign the replaced server certificate. It is best practice to install a CA that is used in your organization to be used for CA certificate for SSL deep inspection. You need to install both private and public key of the CA certificate.

This mode is used for LAN to WAN traffic because you can ensure the CA certificate used is trusted by the endpoints on your LAN.

### Protecting the SSL server

In this mode, FortiGate protects a server that serves SSL protocol. For this mode, you need to install Server Certificate manually (including the private key) to FortiGate. If you have multiple servers to inspect, either you install all server certificates on Server certificate section and apply it to a firewall policy (in this case, FortiGate will pick up the correct certificate for SSL inspection based on client hello SNI) or you may create multiple SSL/SSH profile with a single server certificate each. You can then use different firewall policies with different SSL/SSH profile.

This mode is used when allowing external access to a hosted server. Here you cannot ensure the clients trust a private CA, as in the previous mode.                                                          13

39.    In the Accused Products, "[e]very key should only be generated for a specific single-use encrypt/decrypt purpose, and use beyond that may not offer the level of protection required."[14]

40.    The "computer-readable program code" of the Accused Products "is executable in a hypervisor to perform communication management operations" comprising "authorizing the first network packet in the hypervisor, comprising: comparing the one or more first packet parameters with one or more first expected values."  For example, the Accused Products can perform "Content

---

[13] *See* https://docs.fortinet.com/document/fortigate/7.4.4/ngfw-atp-deployment-guide/408006/deep-packet-inspection (last visited November 10, 2025).

[14] *See* https://www.fortinet.com/resources/cyberglossary/what-is-cryptography (last visited November 10, 2025).

scanning" of a decrypted packet, as shown by the red arrow in the annotated example figure below.



## Protocol enforcement

Protocol enforcement allows you to enforce known protocols (such as FTP, HTTP, and HTTPS) on known ports (such as 21, 80, and 443). If the port of incoming traffic does not match the allowed protocols, or is not allowlisted, then the Intrusion Prevention System (IPS) engine applies the configured violation action, such as blocking or monitoring the traffic.

You can use this feature in the following scenarios:

- When an IPS protocol decoder identifies a network traffic service, it checks whether the service port aligns with the enforced protocols. If the decoder finds a match, that is, the traffic is allowlisted, then the traffic proceeds without restriction. If there is no match, the traffic is classified as a violation and the specified action, monitoring or blocking, is applied.
- When there is no confirmed service for the network traffic, the traffic is classified as a violation if IPS protocol decoders rule out all of the services enforced under its server port.

In an applicable profile, a default network service list can be created to associate well known ports with accepted services. Default ports for network services are defined by FortiGuard. See Application Control Service.

In the following example, an application sensor is configured to enforce HTTP on port 80 (block), and DNS on port 53 (monitor). [16]

41.     The "computer-readable program code" of the Accused Products "is executable in a hypervisor to perform communication management operations" comprising "passing the

---

[15] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/122078/deep-inspection (last visited November 10, 2025) (annotated).

[16] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/410638/protocol-enforcement (last visited November 10, 2025).

authorized first network packet to a virtual device," as shown in the example figure below.



42.    Fortinet has infringed and continues to infringe one or more claims of the '803 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling the Accused Products within the United States, including within this District.

43.    Additionally or alternatively, to the extent Fortinet imports the Accused Products into the United States from manufacturing facilities abroad, such importation constitutes an additional act of infringement in violation of 35 U.S.C. § 271(a).

44.    Additionally or alternatively, Fortinet infringes one or more claims of the '803 patent in violation of 35 U.S.C. § 271(b) by actively inducing its customers to use the Accused Products within the United States, including within this District, by providing instructions and support to its customers to use the Accused Products in a way that directly infringes the '803 patent.  For example, Fortinet regularly schedules webinars to instruct users regarding operation

---

[17] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/122078/deep-inspection (last visited November 10, 2025).

of the Accused Products.[18]

45.    Additionally or alternatively, Fortinet is liable for contributory infringement under 35 U.S.C. § 271(c) by virtue of offering to sell or selling the Accused Products in the United States and/or importing the Accused Products into the United States.  At least as of the date Fortinet received this complaint, Fortinet has known that the Accused Products are especially made and/or adapted for infringement of the '803 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

46.    Additionally or alternatively, Fortinet has infringed and continues to infringe one or more claims of the '803 patent in violation of 35 U.S.C. § 271(f) by supplying in or from the United States for combination outside the country: (1) all or a substantial portion of the components for the patented invention and (2) a component of the patented invention especially made or adapted for use in the invention.  For example, Fortinet supplies and offers to supply the Accused Products from the United States to customers located outside of the United States in such a manner as to actively induce the combination of such components outside the United States in a manner that would infringe the '803 patent if such combination occurred within the United States.

47.    Fortinet had actual knowledge of the '803 patent at least as early as February 9, 2024, when the examiner cited the '803 patent during prosecution of Fortinet's United States Patent No. 12,063,207.

48.    Accordingly, Fortinet's acts of infringement of the '803 patent are being committed with full knowledge of StealthPath's patent rights and full knowledge of infringement.  Fortinet's wrongful conduct thus constitutes willful, intentional, and deliberate infringement, entitling

---

[18] *See* https://www.fortinet.com/corporate/about-us/on-demand?displayAll (last visited November 10, 2025).

StealthPath to enhanced damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

49.     StealthPath has suffered and continues to suffer damages, including lost profits, as a result of Fortinet's infringement of the '803 patent in an amount to be proven at trial, but not less than a reasonable royalty.

50.     StealthPath has satisfied all statutory obligations required to collect pre-filing damages for the infringement of the '803 patent under 35 U.S.C. § 287(a), including by providing notice through its webpage.[19]

51.     Fortinet's infringement has caused irreparable harm to StealthPath, and StealthPath will continue to suffer irreparable harm unless and until that infringement is enjoined by this Court.

## COUNT II:  INFRINGEMENT OF U.S. PATENT NO. 10,965,646

52.     StealthPath repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

53.     Claim 1 of the '646 patent recites:

1. A product for securing communications of a plurality of networked computing devices, the product comprising a non-transitory computer-readable storage medium having computer-readable program code embodied therein, the computer-readable program code executable by a processor to perform communication management operations, the communication management operations comprising:

receiving a first port-to-port network packet from a first computing device;

establishing a secure communication pathway with a user-application at a second computing device of the plurality of networked computing devices, comprising:

---

[19] https://stealthpath.com/patents/ (last visited November 10, 2025).

sending an application identifier to the second computing device via a pre-established communication pathway;

receiving, in response to the sending, a second application identifier for the user-application; and

comparing the second application identifier with a pre-established value for the user-application;

confirming a payload of the first port-to-port network packet conforms to a data model pre-assigned to the pre-established value for the user-application; and

passing the payload to the second computing device via the secure communication pathway.

54.    The Accused Products infringe at least claim 1 of the '646 patent because the Accused Products satisfy each and every limitation of claim 1, either literally or under the doctrine of equivalents.

55.    For example, the Accused Products infringe claim 1 of the '646 patent because they are "[a] product for securing communications of a plurality of networked computing devices, the product comprising a non-transitory computer-readable storage medium having computer-readable program code embodied therein, the computer-readable program code executable by a processor to perform communication management operations," as shown below:





56.    The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "receiving a first port-to-port network packet from a first computing device," as shown in the example figures below.

---

[20] *See* https://www.fortinet.com/resources/data-sheets/fortigate-fortiwifi-40f-series (last visited November 10, 2025).

[21] *See* https://docs.fortinet.com/document/fortigate/5.4.0/cookbook/75963/integrating-a-fortigate-with-forticlient-ems (last visited November 10, 2025).





---

[22] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/122078/deep-inspection (last visited November 10, 2025).

[23] *See* https://docs.fortinet.com/document/fortigate/6.2.16/cookbook/19814/basic-category-filters-and-overrides (last visited November 10, 2025).

**Routing (including SD-WAN)**

Routing uses the routing table to determine the interface to be used by the packet as it leaves the FortiGate. Routing also distinguishes between local traffic and forwarded traffic. Firewall policies are matched with packets depending on the source and destination interface used by the packet. The source interface is known when the packet is received and the destination interface is determined by routing.

SD-WAN is a special application of routing that provides route selection, load balancing, and failover among two or more routes. SD-WAN also supports using the Internet Services Database (ISDB) and Application Control to select a route in the following way:

- SD-WAN uses Application Control to compare the first packet of a new session against the layer 4 ISDB.
- If Application Control can identify the new session as a known application, SD-WAN is applied to the session according to the matching SD-WAN rule. SD-WAN then routes all of the packets in the session according to the selected SD-WAN rule.
- If Application Control cannot match a new session with an application in the layer 4 ISDB, the implicit SD-WAN rule is applied to the session.

As the session is being processed by the implicit SD-WAN rule, layer 7 Application Control attempts to identify the application. If the application can be identified, the ISDB is extended by adding a layer 4 match record for the application to the ISDB cache. New sessions can then be matched and routed by SD-WAN using both the ISDB and the ISDB cache.

**Stateful inspection/policy lookup/session management**

Stateful inspection looks at the first packet of a session and looks in the policy table to make a security decision about the entire session. Stateful inspection looks at packet TCP SYN and FIN flags to identify the start and end of a session, the source/destination IP, source/destination port and protocol. Other checks are also performed on the packet payload and sequence numbers to verify it as a valid session and that the data is not corrupted or poorly formed.

When the first packet of a session is matched in the policy table, stateful inspection adds information about the session to its session table. So when subsequent packets are received for the same session, stateful inspection can determine how to handle them by looking them up in the session table (which is more efficient than looking them up in the policy table).

Stateful inspection makes the decision to drop or allow a session and apply security features to it based on what is found in the first packet of the session. Then all subsequent packets in the same session are processed in the same way.

When the final packet in the session is processed, the session is removed from the session table. Stateful inspection also has a session idle timeout that removes sessions from the session table that have been idle for the length of the timeout.

See the Stateful Firewall Wikipedia article (https://en.wikipedia.org/wiki/Stateful_firewall) for an excellent description of stateful inspection. [24]

57.    The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "establishing a secure communication pathway with a user-application at a second computing device of the plurality of networked computing devices, comprising: sending an application identifier[, *e.g.*, a server certificate,] to the second computing device[, *e.g.*, a client device,] via a pre-established communication pathway."[25]

---

[24] *See* https://docs.fortinet.com/document/fortigate/6.4.0/parallel-path-processing-life-of-a-packet/86811/packet-flow-ingress-and-egress-fortigates-without-network-processor-offloading (last visited November 10, 2025).

[25] *See* https://community.fortinet.com/t5/FortiGate/Technical-Tip-SSL-TLS-and-the-use-of-Digital-Certificates/ta-p/214958 (last visited November 10, 2025).

1. **TLS Client -> Client Hello -> TLS Server.**

   Client Hello:
   • Contains support ciphers.

2. **TLS Server -> Server Hello -> TLS Client.**
   Server hello:
   • Contains chosen cipher (overlaps with the client support ciphers).
   • Contains server details.
   • Contains a server certificate.
   • MAY contain a request for a client certificate if configured on the server.

3. **TLS Client -> Client Key Exchange -> TLS Server.**
   • The exchange will lead to a change of cipher spec (encrypted).
   • If requested from the server, this message will also contain a certificate from the client.



*Typical TLS exchange*

58.     The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "receiving, in response to the sending, a second application identifier for the user-application." For example, as shown in the figure above, the Accused Products receive a second application identifier, *e.g.*, a client certificate/key, for the user-application in response to sending the first application identifier.

59.     The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "comparing the second application identifier with a pre-established value for the user-application." For example,

as shown in the figure above, the second application identifier, *e.g.*, the client certificate/key, is verified by the server.  The figures below also demonstrate the validation process.[26]

**1. Certificate Chain:**

A certificate chain is a link of an end entity certificate (web server certificate or client certificate for example) to another certificate that issued this same certificate. This issuing certificate usually goes by the name of Certificate Authority (CA).

With the example of a server certificate, a chain typically looks like this:

- Server certificate.
- Server certificate is issued by an intermediate CA certificate, also called a subordinate CA.
- A subordinate CA is issued by a root CA.

The public key is required to verify that a certificate was signed (or issued) by a specific authority certificate.

The public keys of certificates are distributed to clients in the 'Trusted root certificate authority store'.
Web browsers and operating systems have a pre-filled store with the public keys of the known certificate authorities.

60.    The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "confirming a payload of the first port-to-port network packet conforms to a data model pre-assigned to the pre-established value for the user-application."  For example, the Accused Products confirm that the packet payload from a given application conforms to a data model pre-assigned to the pre-established value for the user-application.

## Port enforcement check

Most networking applications run on specific ports. For example, SSH runs on port 22, and Facebook runs on ports 80 and 443.

If the default network service is enabled in the application control profile, the IPS engine performs a check at the application profile level, and any detected application signatures running on the non-standard TCP/IP port are blocked. This means that each allowed application runs on its default port.[27]

---

[26] *See* https://community.fortinet.com/t5/FortiGate/Technical-Tip-SSL-TLS-and-the-use-of-Digital-Certificates/ta-p/214958 (last visited November 10, 2025).

[27] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/66882/port-enforcement-check (last visited November 10, 2025).

FortiClient

| Outgoing ports | | |
|---|---|---|
| Purpose | | Protocol/Port |
| FortiAnalyzer | Send logs to FortiAnalyzer (FortiClient must connect to FortiGate or EMS to send logs to FortiAnalyzer) | TCP/514 |
| FortiAuthenticator | SSO Mobility Agent, FSSO | TCP/8001 |
| FortiClient EMS | Endpoint management | TCP/8013 |
| FortiGate | Remote IPsec VPN access | UDP/IKE 500, ESP (IP 50), NAT-T 4500 |
| | Remote SSL VPN access | TCP/443 (by default; this port can be customized) |
| | SSO Mobility Agent, FSSO | TCP/8001 |
| | Compliance and Security Fabric | TCP/8013 (by default; this port can be customized) |
| FortiGuard | AV/VUL signatures update, Cloud-based behavior scan (CBBS)/applications that use cloud services | TCP/80 |
| | Virus submission (SMTP/FortiGuard) | TCP/25 |
| | URL rating | UDP/8888 (by default; this port can be changed to port 53 by entering fgd1.fortigate.com:53 via the XML config file) |

[28]

61.     The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "passing the payload to the second computing device via the secure communication pathway."   For example, the payload is passed to the second computing device via the secure communication pathway in the example figure below. [29]

---

[28] *See* https://docs.fortinet.com/document/fortigate/6.4.0/ports-and-protocols/788212/forticlient-open-ports (last visited November 10, 2025).

[29] *See* https://www.fortinet.com/products/sd-wan (last visited November 10, 2025).



62.    Fortinet has infringed and continues to infringe one or more claims of the '646 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling the Accused Products within the United States, including within this District.

63.    Additionally or alternatively, to the extent Fortinet imports the Accused Products into the United States from manufacturing facilities abroad, such importation constitutes an additional act of infringement in violation of 35 U.S.C. § 271(a).

64.    Fortinet has infringed and continues to infringe one or more claims of the '646 patent in violation of 35 U.S.C. § 271(b) by actively inducing its customers to use the Accused Products within the United States, including within this District, by providing instructions and support to its customers, including through its regularly-scheduled webinars described above.

65.    Additionally or alternatively, Fortinet is liable for contributory infringement of any such claim under 35 U.S.C. § 271(c) by virtue of offering to sell or selling the Accused Products in the United States and/or importing the Accused Products into the United States.  At least as of the date Fortinet received this complaint, Fortinet has known that the Accused Products are especially made and/or adapted for infringement of the '646 patent, and not a staple article or

commodity of commerce suitable for substantial non-infringing use.

66.      Additionally or alternatively, Fortinet has infringed and continues to infringe one or more claims of the '646 patent in violation of 35 U.S.C. § 271(f) by supplying in or from the United States for combination outside the country: (1) all or a substantial portion of the components for the patented invention and (2) a component of the patented invention especially made or adapted for use in the invention.  For example, Fortinet supplies and offers to supply the Accused Products from the United States to customers located outside of the United States in such a manner as to actively induce the combination of such components outside the United States in a manner that would infringe the '646 patent if such combination occurred within the United States.

67.      Accordingly, Fortinet's acts of infringement of the '646 patent are being committed with full knowledge of StealthPath's patent rights and full knowledge of infringement.  Fortinet's wrongful conduct thus constitutes willful, intentional, and deliberate infringement, entitling StealthPath to enhanced damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

68.      StealthPath has suffered and continues to suffer damages, including lost profits, as a result of Fortinet's infringement of the '646 patent in an amount to be proven at trial, but not less than a reasonable royalty.

69.      StealthPath has satisfied all statutory obligations required to collect pre-filing damages for the infringement of the '646 patent under 35 U.S.C. § 287(a), including by providing notice through its webpage.[30]

70.      Fortinet's infringement has caused irreparable harm to StealthPath, and StealthPath will continue to suffer irreparable harm unless and until that infringement is enjoined by this Court.

---

[30] https://stealthpath.com/patents/ (last visited November 10, 2025).

## COUNT III:  INFRINGEMENT OF U.S. PATENT NO. 11,729,143

71.     StealthPath repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

72.     Claim 1 of the '143 patent recites:

> 1.  A product for securing communications of a plurality of networked computing devices, the product comprising a non-transitory computer-readable storage medium having computer-readable program code embodied therein, the computer-readable program code executable by a processor to perform communication management operations, the communication management operations comprising:
>
>     consuming a first network packet to obtain a first payload and a destination port number, the destination port number assigned to a destination port on one of the plurality of networked computing devices;
>
>     confirming the first payload conforms to at least one of a data model pre-assigned to the destination port number;
>
>     after confirmation that the first payload conforms to the data model for the destination port, forming a second network packet comprising a second payload, and at least one of a local program identification code, and a data model identification code; and
>
>     executing at least one instruction to send the second network packet to network security software to the destination port on the one of the plurality of networked computing devices via a secure communication pathway.

73.     The Accused Products infringe at least claim 1 of the '143 patent because the Accused Products satisfy each and every limitation of claim 1, either literally or under the doctrine of equivalents.

74.     For example, the Accused Products infringe claim 1 of the '143 patent because they are "[a] product for securing communications of a plurality of networked computing devices, the product comprising a non-transitory computer-readable storage medium having computer-readable program code embodied therein, the computer-readable program code executable by a

processor to perform communication management operations," as shown below:



75.    The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "consuming a first network packet to obtain a first payload and a destination port number, the destination port number assigned to a destination port on one of the plurality of networked computing devices."  For example, the Accused Products "can recognize network traffic generated by a large number of applications.  Application control sensors specify what action to take with the application traffic."[32]

---

[31] *See* https://www.fortinet.com/resources/data-sheets/fortigate-fortiwifi-40f-series (last visited November 10, 2025).

[32] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/302748/application-control (last visited November 10, 2025).

## Application control

FortiGates can recognize network traffic generated by a large number of applications. Application control sensors specify what action to take with the application traffic. Application control uses IPS protocol decoders that can analyze network traffic to detect application traffic, even if the traffic uses non-standard ports or protocols. Application control supports traffic detection using the HTTP protocol (versions 1.0, 1.1, and 2.0).



FortiOS includes three preloaded application sensors:

- *default* (monitors all applications)
- *wifi-default* (default configuration for offloading WiFi traffic)
- *block-high-risk*

You can customize these sensors, or you can create your own to log and manage the applications on your network.

Once configured, you can add the application sensor to a firewall policy.

 This functionality requires a subscription to FortiGuard Application Control.

76.     Additionally, the Accused Products can obtain a destination port number, as shown in the example figure below.[33]



77.     The "computer-readable program code" of the Accused Products is "executable by

---

[33] *See* https://docs.fortinet.com/document/fortigate/6.2.16/cookbook/410638/protocol-enforcement (last visited November 10, 2025).

a processor to perform communication management operations" comprising "confirming the first payload conforms to at least one of a data model pre-assigned to the destination port number." For example, the Accused Products have customizable associations between particular port numbers and specific applications.[34]

**Port enforcement check**

Most networking applications run on specific ports. For example, SSH runs on port 22, and Facebook runs on ports 80 and 443.

If the default network service is enabled in the application control profile, the IPS engine performs a check at the application profile level, and any detected application signatures running on the non-standard TCP/IP port are blocked. This means that each allowed application runs on its default port.

78.    For example, the Accused Products can compare the first packet parameters with the first expected value, *e.g.*, to filter applications.[35]

Protocol enforcement allows you to enforce known protocols (such as FTP, HTTP, and HTTPS) on known ports (such as 21, 80, and 443). If the port of incoming traffic does not match the allowed protocols, or is not allowlisted, then the Intrusion Prevention System (IPS) engine applies the configured violation action, such as blocking or monitoring the traffic.

79.    The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "after confirmation that the first payload conforms to the data model for the destination port, forming a second network packet comprising a second payload, and at least one of a local program identification code, and a data model identification code." For example, the Accused Products form and transmit a second network packet with a second payload which includes, *e.g.*, a local program identification code identifying the FortiClient agent software on the end user's device.

---

[34] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/66882/port-enforcement-check (last visited November 10, 2025).

[35] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/410638/protocol-enforcement (last visited November 10, 2025).

## Reasons for using deep inspection

While Hypertext Transfer Protocol Secure (HTTPS) offers protection on the Internet by applying Secure Sockets Layer (SSL) encryption to web traffic, encrypted traffic can be used to get around your network's normal defenses.

For example, you might download a file containing a virus during an e-commerce session, or you might receive a phishing email containing a seemingly harmless download that, when launched, creates an encrypted session to a command and control (C&C) server and downloads malware onto your computer. Because the sessions in these attacks are encrypted, they might get past your network's security measures.

When you use deep inspection, the FortiGate impersonates the recipient of the originating SSL session, then decrypts and inspects the content to find threats and block them. It then re-encrypts the content and sends it to the real recipient.[36]



---

[36] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/122078/deep-inspection (last visited November 10, 2025).

[37] *See* https://docs.fortinet.com/document/fortigate/7.6.2/administration-guide/122078/deep-inspection (last visited November 10, 2025).



80.     The "computer-readable program code" of the Accused Products is "executable by a processor to perform communication management operations" comprising "executing at least one instruction to send the second network packet to network security software to the destination port on the one of the plurality of networked computing devices via a secure communication pathway."  For example, the Accused Products send the second network packet to network security software, *e.g.*, FortiClient, to the destination port on the one of the plurality of networked computing devices via a secure communication pathway in the example figure below.[39]

---

[38] *See* https://www.fortinet.com/products/sd-wan (last visited November 10, 2025).

[39] *See id.*



81.     Fortinet has infringed and continues to infringe one or more claims of the '143 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling the Accused Products within the United States, including within this District.

82.     Additionally or alternatively, to the extent Fortinet imports the Accused Products into the United States from manufacturing facilities abroad, such importation constitutes an additional act of infringement in violation of 35 U.S.C. § 271(a).

83.     Fortinet has infringed and continues to infringe one or more claims of the '143 patent in violation of 35 U.S.C. § 271(b) by actively inducing its customers to use the Accused Products within the United States, including within this District, by providing instructions and support to its customers, including through the regularly-scheduled webinars discussed above.

84.     Additionally or alternatively, Fortinet is liable for contributory infringement of any such claim under 35 U.S.C. § 271(c) by virtue of offering to sell or selling the Accused Products in the United States and/or importing the Accused Products into the United States.  At least as of the date Fortinet received this complaint, Fortinet has known that the Accused Products are especially made and/or adapted for infringement of the '143 patent, and not a staple article or

commodity of commerce suitable for substantial non-infringing use.

85.     Fortinet has infringed and continues to infringe one or more claims of the '143 patent in violation of 35 U.S.C. § 271(f) by supplying in or from the United States for combination outside the country: (1) all or a substantial portion of the components for the patented invention and (2) a component of the patented invention especially made or adapted for use in the invention. For example, Fortinet supplies and offers to supply the Accused Products from the United States to customers located outside of the United States in such a manner as to actively induce the combination of such components outside the United States in a manner that would infringe the '143 patent if such combination occurred within the United States.

86.     Accordingly, Fortinet's acts of infringement of the '143 patent are being committed with full knowledge of StealthPath's patent rights and full knowledge of infringement.  Fortinet's wrongful conduct thus constitutes willful, intentional, and deliberate infringement, entitling StealthPath to enhanced damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

87.     StealthPath has suffered and continues to suffer damages, including lost profits, as a result of Fortinet's infringement of the '143 patent in an amount to be proven at trial, but not less than a reasonable royalty.

88.     StealthPath has satisfied all statutory obligations required to collect pre-filing damages for the infringement of the '143 patent under 35 U.S.C. § 287(a), including by providing notice through its webpage.[40]

89.     Fortinet's infringement has caused irreparable harm to StealthPath, and StealthPath will continue to suffer irreparable harm unless and until that infringement is enjoined by this Court.

---

[40] https://stealthpath.com/patents/ (last visited November 10, 2025).

## PRAYER FOR RELIEF

**WHEREFORE**, StealthPath respectfully requests the following relief:

(A)     The entry of judgment in favor of StealthPath, and against Fortinet, that Fortinet has infringed and continues to infringe one or more claims of each of the Asserted Patents;

(B)     An Order preliminarily and permanently enjoining Fortinet and its officers, agents, employees, and those in privity or in active concert or participation with them, from further infringement of the Asserted Patents;

(C)     The entry of a judgment awarding StealthPath compensatory damages resulting from Fortinet's infringement in an amount according to proof, including no less than a reasonable royalty;

(D)     Enhanced damages pursuant to 35 U.S.C. § 284;

(E)     Pre-judgment and post-judgment interest;

(F)     Attorneys' fees based on this being an exceptional case pursuant to 35 U.S.C. § 285, including pre-judgment interest on such fees;

(G)     An accounting and/or supplemental damages for all damages incurred by StealthPath from the date of issue of each Asserted Patent through entry of a final, non-appealable judgment;

(H)     If this Court declines to enjoin Fortinet from infringing any of the Asserted Patents, damages for future infringement in lieu of an injunction; and

(I)     Such further relief as the Court deems just and proper.

## JURY DEMAND

StealthPath respectfully demands a trial by jury on all issues so triable.

DATED: December 8, 2025                 Respectfully submitted,

*/s/ Blake R. Davis by permission Andrea Fair*

**LATHAM AND WATKINS LLP**
Blake Davis
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600
Fax: (415) 391-8095
Blake.Davis@lw.com

Perry Viscounty (*pro hac vice* to be filed)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel: (714) 540-1235
Fax: (714) 755-8290
Perry.Viscounty@lw.com

Adam Greenfield
Qiushi (William) Yao (*pro hac vice* to be filed)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Adam.Greenfield@lw.com
William.Yao@lw.com

Of Counsel:

Andrea L. Fair
Texas Bar No. 24078488
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
Telephone: (903) 757-6400
Facsimile: (903) 757-2323
andrea@millerfairhenry.com

**ATTORNEYS FOR PLAINTIFF STEALTHPATH IP INC.**